IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

DENNIS J. DUPRAY, as Beneficial Owner and )
Managing Partner of TRACBEAM, LLC, and )
TRACBEAM, LLC )
                                       )     Case No. 3:22-cv-01014
                                       )
           Plaintiffs,         )
                                         )     Judge Eli J. Richardson
v.                                     )     Magistrate Judge Jeffery S. Frensley
                                         )
OXFORD INSURANCE COMPANY TN LLC, )      JURY DEMAND
and SERIES PROTECTED CELL 1, a Series )
Entity of OXFORD INSURANCE COMPANY )
TN, LLC, )
                                         )
          Defendants        )

---

## DEFENDANTS' MEMORANDUM IN SUPPORT OF
## MOTION FOR JUDGMENT ON THE PLEADINGS

---

### Summary of Argument

The issues in this case arise out of a Policy of Insurance ("the Policy") issued by the

Defendant, SERIES PROTECTED CELL 1, a Series Entity of Defendant OXFORD

INSURANCE COMPANY TN LLC ("Series 1") to the Plaintiff, TRACBEAM, LLC

("TracBeam"), and in particular "actual net loss" insurance coverage for "Loss of a Key Supplier."

TracBeam, which is in the business of holding patents, defending those patents, and litigating with

alleged infringers, designated its law firm, Dovel & Luner, LLP ("Dovel & Luner" or the "law

firm") as a "Key Supplier" under the Policy. TracBeam alleges that its law firm brought more

than a dozen infringement actions between 2011 and 2018, which were "very successful" and

recovered as much as $1 Million "most years." **Third Amended Complaint ¶ 9 (ECF 94, #961)**.

But increased litigation expenses and risk that had occurred over the years led the law firm to

change the terms of its representation in June 2017, limiting its representation to four infringers while providing that the law firm could terminate its representation if it concluded that "the expected value of your case has changed such that it is no longer worthwhile to pursue." **Third Amended Complaint ¶¶ 25, 28 (ECF 94, #968); Answer at Exhibit 9 (ECF 100-9, #1081).** After resolving two of these four matters, on April 18, 2019, TracBeam's law firm - - "[i]n response to [TracBeam's] request" - - sent a written notification terminating the law firm's legal services**. Answer at Exhibit 10 (ECF 100-10, #1082).** Within hours, TracBeam filed a Notice of Claim with Oxford seeking $1 Million for insurance coverage for the "Loss of Key Supplier." **Answer at Exhibit 11 (ECF 100-11, #1083).**

Under the terms of the Policy, the "Loss of a Key Supplier" is covered only when the termination is "as a result of" certain specified events. Those events include the "wrongful" termination of the relationship, the death, or merger, or bankruptcy of the "Key Supplier," or other specified reasons. Here, the Plaintiffs claim that the end of the law firm's relationship with TracBeam was caused by "the adoption or promulgation of federal, state or local laws, regulations or ordinances, by any legislative body, executive authority or agency" that increased the law firm's costs or expenses and caused it to withdraw its services from the market. Policy at ¶I.GG.39.b.v (p. 19). **Answer at Exhibit 6 (ECF 100-6, #1055).**

Dovel & Luner's termination letter stated that "we do not believe that the remaining infringement actions that TracBeam, LLC may be able to bring against the remaining infringers in the industry would be sufficiently beneficial, economically, to our firm." This conclusion was based, "primarily in light of : (a) the costs and risks associated with likely IPR [inter partes review] filings at the PTAB [Patent Trial and Appeals Board] and motion practice under the recent line of Section 101 cases from the Federal Circuit and various district courts, and (b) the difficulty in

2

bringing suit against one or more infringers in a suitable venue, following the strict requirements of the TC Heartland decision by the Supreme Court in May 2017." **Answer at Exhibit 10 (ECF 100-10, #1082).** TracBeam claims that these two events fall within the "legislative or executive" regulatory changes provision of "Loss of Key Supplier." Specifically, TracBeam claims the decision of the U.S. Supreme Court in *TC Heartland LLC v. Kraft Foods Group Brands LLC*, 581 U.S. 258 (2017) ("*TC Heartland*"), which held that the patent venue statute, 28 U.S.C. §1400(b), did not permit plaintiffs to bring a patent infringement action in any judicial district where an infringement occurred (thus depriving TracBeam of its preferred venue in the Eastern District of Texas) was "the adoption or promulgation of federal, . . . laws, regulations or ordinances, by any legislative body, executive authority or agency." **Third Amended Complaint ¶¶ 29, 31, 33 at n. 6 (ECF 94, ## 968, 969-70).** TracBeam also claims that the statutory and regulatory changes implemented as part of the America Invents Act of 2011 (AIA), which led the law firm to limit its engagement in 2017, caused this loss in 2019. **Id.**

Neither claim for coverage is valid.

First, the Supreme Court's unanimous decision in *TC Heartland* was not "an adoption or promulgation of federal, state or local laws, regulations or ordinances, by any legislative body, executive authority or agency." The U.S. Supreme Court is not a legislative body, is not an executive authority, and is not an agency. It is the head of the judicial branch of government and is separate from both the legislative and executive branches. A "judicial body" is not included in the plain language of the Policy, which is limited solely to the acts of the legislative or executive branches. Moreover, the actual decision in *TC Heartland* did not "adopt" or "promulgate" any "laws, regulations or ordinances" because that is not what federal courts do. Rather, federal courts interpret the "laws, regulations or ordinances" that are enacted or promulgated by Congress or the

Executive Branch. Indeed, as *TC Heartland* makes clear, the Court did not change any statute, law, or regulation; rather it ruled that the patent venue statute, 28 U.S.C §1400(b), had not changed since its enactment in 1948. While this "changed" the prior erroneous interpretation of the lower courts that the general venue statute had somehow overridden the patent venue statute, the Supreme Court's decision makes clear that it did not adopt or promulgate any new "laws, regulations or ordinances."

Nor can any increase in costs caused by the AIA be used as a basis to claim a loss in 2019. The Policy insures against (1) changes in administrative procedures or regulations that (2) occur during the Policy year and (3) lead to increased costs that (4) result in the termination of the relationship. Put simply, both the loss and the cause of the loss must occur during the Policy Year (2018-2019). The Third Amended Complaint, however, makes it clear that the AIA increased costs by establishing an inter partes review process that permitted TracBeam's patents to be challenged before the PTAB. TracBeam was aware of and had dealt with the increased costs created by inter partes review since 2012, and specifically alleges that by 2017 TracBeam had been involved in 29 such reviews. **Third Amended Complaint ¶ 23. (ECF 94, #967).** Indeed, the Third Amended Complaint and the terms of the new engagement agreement with the law firm reveals that the increase in expenses caused by the AIA led the law firm to revise its engagement, limiting it to four infringers while providing that the law firm could withdraw if it did not believe that TracBeam's claims warranted further prosecution. Neither the law firm's later termination letter nor the Third Amended Complaint cite or point to any change in procedures or rules under the AIA that occurred during the year the Policy was in effect as the cause of the termination. TracBeam cannot claim that a loss in 2019 was caused by events that took place years earlier and outside the policy period. To do so violates basic principles of insurance, and would permit

4

TracBeam to purchase insurance against risks that had already occurred - - it is akin to permitting a homeowner to purchase a fire insurance policy while a fire is smoldering in the kitchen.

In addition, Exclusion A of the Policy bars coverage for a loss "related to or caused directly or indirectly by:  A.  any fact, circumstance, situation, transaction, . . . or **Administrative Action** or event which, as of the **Initial Effective Date, Insured** knew or reasonably should have known would be likely to result in the occurrence of a **Scheduled Event.**"  Policy, ¶ V.A. at p 29 **Answer at Exhibit 6 (ECF 100-6, #1065).**[1]  The Third Amended Complaint makes clear that both TracBeam and its law firm had for years known of the changes wrought by the AIA and the increase in costs caused by those changes.  In fact, they had changed the terms of their engagement as a result.   The terms of the law firm's engagement further made it plain that the law firm could unilaterally terminate its representation whenever it determined that "the expected value of your case has changed such that it is no longer worthwhile to pursue." Thus, all of the facts and circumstances that led to this loss, and the obvious prospect that at some point the law firm would end its representation, were known to TracBeam.  A reasonable person would have known under these circumstances that the law firm's limited representation would end.

Perhaps in recognition that there is no coverage for this claim, TracBeam has now raised a new claim of promissory estoppel, attempting to expand the coverage available under the Policy through estoppel.  Its claim is based upon statements made before the Policy was first issued in 2015 that TracBeam alleges led it to believe that judicial decisions and any losses from any changes in patent laws would be covered.  TracBeam, however, admits that it paid the requested premium for its Policy; under Tennessee law, the payment of premium for a policy of insurance creates a

---

[1] Terms in **bold** contained in the Policy simply denote defined terms.  When quoting from the Policy, such bold terms will be used.  When referring to defined terms in this Memorandum, the terms will simply be capitalized (i.e., "Insured").

rebuttable presumption that the insured accepted the coverage as provided.  Tenn. Code Ann. §56-7-135(b).  Moreover, this rebuttable presumption has the effect of turning an insured's claimed "reliance" on extracontractual representations from a question of fact into a question of law about "reasonableness."  *Vanquish Worldwide, LLC v. Sentinel Ins. Co., Ltd.,* 2022 WL 189791, at *3 (Tenn. Ct. App. Jan. 21, 2022).  Where the Policy makes it plain that no other agreements exist, and no changes can be made absent an endorsement, federal courts applying Tennessee law have dismissed claims for promissory estoppel based on a lack of reasonable reliance.  "Tennessee decisions make clear that . . . where the policy states that its terms can be amended or waived only by the company, the insured is charged with that knowledge and a claim for waiver by estoppel will not lie."  *Depositors Ins. Co. v. Estate of Ryan,* 212 F. Supp.3d 728, 734 (W.D. Tenn. 2015).  *See Builders Mut. Ins. Co. v. Pickens,* 2013 WL 3788225, at *3 (E.D. Tenn July 18, 2013) ("where the policy states that its terms can be amended or waived only by the company, the insured is charged with that knowledge and a claim for waiver by estoppel will not lie.").

Here the Policy plainly states that its terms constitute the "Entire Agreement" and "supersede[ ] all prior and contemporaneous agreements and oral understandings," Policy, ¶ IX D at p 33 **Answer at Exhibit 6 (ECF 100-6, #1069)**.  It also states that the Policy can be amended "only by an endorsement executed by an authorized representative."  Policy, ¶ IX D at 33, **Answer at Exhibit 6 (ECF 100-6, #1069)**.  And on the first page, in capital and bold-faced letters, the Policy tells the Insured to "**READ THE ENTIRE POLICY CAREFULLY TO DETERMINE RIGHTS, DUTIES AND WHAT IS AND IS NOT COVERED.**"  Policy at 1, **Answer at Exhibit 6 (ECF  100-6, #1037)**.

TracBeam's claim that other, earlier documents, led it to believe there would be coverage not only is insufficient to overcome this presumption and Policy language, but is undermined by

6

the documents TracBeam relies on. While TracBeam claims that it believed it had coverage based upon a risk assessment of its business that was performed before the Policy was issued, the agreement that it entered for the assessment makes clear that the entity with which it was working was "not an insurance agent, broker, or advisor and do not and are not licensed to sell insurance." **Answer at Exhibit 4 (ECF 100-4, #1031).** The risk assessment report on which this claim rests not only did not represent what the Policy would and would not cover, but specifically warned that "Care should be given to understand the specific losses that **Loss of Key Supplier** and **Supplier/Supply Chain** coverage may insure against." **Answer at Exhibit 5 (ECF 100-5, #1034).** And an actuarial analysis cited by the Third Amended Complaint cautions that "data and associated assumptions should be reviewed for consistency with the internal records of . . . TracBeam, LLC." **Answer at Exhibit 7 (ECF 100-7, #1073).**

TracBeam's Complaint further fails to allege plausibly that it suffered an actual net loss between 2019 and 2020. The Policy limits coverage to only net losses that occur during the 12-month period beginning at the law firm's termination. Policy ¶I.Q. **Answer at Exhibit 6 (ECF 100-6, #1040).** To show that it suffered covered damages, TracBeam must allege that it owned patents that continued to be infringed, that it would have litigated those patents had the law firm not terminated its services, and that between April 2019 and April 2020 it could have either successfully recovered damages (or reached settlements) which would have generated net profits. But TracBeam's newest Complaint proves just the opposite. According to the Complaint, TracBeam retained new counsel in December 2019, yet as of September 2023, it had filed NO infringement claims. **Third Amended Complaint ¶ 42 (ECF 94, #973).** Thus, in nearly four years, TracBeam has not only not settled or resolved any claims, but it has not even started any litigation.

Finally, Dennis J. Dupray ("Dupray") is not a proper Plaintiff in this matter. This is claim for breach of contract and the only parties to the insuring contract are TracBeam as the "Named Insured," and Series Protected Cell 1. Because TracBeam is a limited liability company, **Third Amended Complaint ¶ 5 (ECF 94, #959)**, the only proper party is TracBeam itself, and neither its members nor its managing partner have standing to bring a claim in their individual capacities. *See Johnstown Feed & Seed, Inc. v. Continental Western Ins. Co.*, 641 F. Supp. 2d 1167, 1173–75 (D. Colo. 2009).

## Statement of Facts

TracBeam, a Colorado Limited Liability Company, was formed by Dupray for the purpose of receiving assignments of his inventions or for obtaining patents for these ideas. **Third Amended Complaint ¶ 5 (ECF 94, ##959-60).** To enforce its patent rights, TracBeam retained the law firm under a written engagement letter on September 10, 2010. Dovel & Luner then filed and settled a dozen patent infringement actions in the U.S. District Court for the Eastern District of Texas between 2010 and 2018. **Third Amended Complaint ¶¶ 9-11 (ECF 94, #961).** TracBeam alleges that in the face of increasing costs created by the AIA (all of which were borne by the law firm), in 2014 it began the process of investigating captive insurance to provide "some measure of protection in the event that TracBeam lost" the services of its law firm. **Third Amended Complaint ¶¶ 12 (ECF 94, #961).**

### Oxford Issues the Policy to TracBeam

On September 15, 2014, Dupray executed an Engagement Agreement with Oxford Research Group LLC for the purpose of doing a feasibility analysis to establish a Tennessee captive insurance company. **Third Amended Complaint ¶¶ 13-14 (ECF 94, ##962-63).** Captive insurance is not commercially available for sale to the general public. Instead, it is used to insure

8

various enterprise risks for specific companies. Premium is paid by a company in exchange for a Policy; the premium is then ceded to a captive insurance company (typically established by the owner of the company, here Dupray) which reinsures the risks under the Policy (in combination with similar captive insurance companies in the risk pool). The premium paid by TracBeam is 100% ceded to a captive insurance company formed by Dupray to insure up to the first 49% of the loss on the risks of TracBeam, as well as a quota share of the losses sustained in the risk pool by other, similar, captive companies. **Answer ¶ 19 and Exhibit 7 (ECF 100-7, #1073 ).** If the claims experience is favorable, then the captive the ceded premium payments and any investment gains that remain is paid to Dupray when the captive is closed. **Answer at Exhibit 7 (pro forma balance sheets) (ECF 100-7, #1073).** In this way, smaller businesses can take advantage of establishing captive insurance companies in the same way that large companies have done for years.

The Engagement Agreement, in addition to outlining the purpose of the engagement, also and informed Dupray:

> ORG is an affiliate of Oxford Insurance. Our sole purpose is to educate you about captive insurance arrangements and perform a feasibility analysis of a possible arrangement between you and Oxford Insurance on your behalf. We are not an insurance agent, broker or advisor and do not and are not licensed to sell insurance, enter into a captive insurance arrangement, or sell any series of any company or any securities. We will not be rendering any legal, tax, investment, financial or other advice . . . . You are advised and encouraged to engage any advisors or counsel you deem necessary in making a decision to engage in a captive insurance . . . agreement.

**Answer at Exhibit 4 (ECF 100-4, #1031).**

Another entity, Risk International Services, Inc., performed a "Review of Insurance Programs and Exposures," issuing a report on October 10, 2014. **Answer at Exhibit 5 (ECF 100-5, #1034).** The Plaintiffs allege that this review "went into detail regarding the law firm,"

9

concluding that it would be "difficult" to replace the law firm and "extremely difficult to find competent patent litigation attorneys, particularly, retained on a contingency fee basis." **Third Amended Complaint ¶¶ 15 (ECF 94, #963).** The Plaintiffs claim that "[w]ith that kind of specificity . . . the insured had reason to believe that Defendants were both aware of, and were assuming coverage for, one of the most prominent risks for which the Policy was being purchased." **Id.** The Review, however, after an extended discussion of "Loss of Key Supplier," specifically warned about the limitations of coverage for the loss of the law firm:

> Inasmuch as TracBeam is concerned it would be very difficult to find quality attorneys who have the expertise that TracBeam needs, this is an important exposure to TracBeam. The challenge is whether the firm TracBeam hires to represent them can be considered a supplier. ***Care should be given to understand the specific losses that Loss of Key Supplier and Supplier/Supply Chain coverage may insure against.***

**Answer at Exhibit 5 (ECF 100-5, #1034)** (emphasis supplied).

After receipt of the Review, an actuarial analysis was performed for the purpose of generating pro forma balance sheets to model the performance of Dupray's proposed captive insurance company. In the course of generating this analysis, the report accurately quoted what would be the Policy language of "Loss of Key Supplier." It further cautioned at least twice that "data and assumptions should be reviewed for their consistency with the internal records of . . . TracBeam, LLC." **Answer at Exhibit 5 (ECF 100-5, #1073).**

Dupray established a captive insurance company in Tennessee, SPC 43, as part of a transaction to insure specified enterprise risks for TracBeam. **Third Amended Complaint ¶ 19 and n. 3 (ECF 94, #966).** As part of this process, and before paying premium and entering into the Policy, TracBeam was provided a template of the Policy that set forth all potential covered events and exclusions. Dupray then selected 30 separate risks to insure, which ranged from Administrative Actions to Workplace Violence. **Answer at Exhibit 15 (ECF 100-15, #1095).** This

10

process was repeated each Policy year, and TracBeam affirmatively selected the coverages it desired. In 2018, TracBeam not only received the proposed Policy coverages that were available, but had attorneys review the coverages. **Answer at Exhibit 16 (ECF 100-16, #1097).** The aggregate premium for the coverages reviewed and selected in 2018 amounted to $1,026,437, which was paid by TracBeam to Series 1 and ceded to Dupray's captive insurance company.

The Policy Provisions

On the first page of the Policy, the Plaintiffs were told:

> **VARIOUS PROVISIONS RESTRICT COVERAGE. READ THE ENTIRE POLICY CAREFULLY TO DETERMINE RIGHTS, DUTIES AND WHAT IS AND IS NOT COVERED.**

Policy at p. 1 **Answer at Exhibit 6 (ECF 100-6, #1037).**

TracBeam is specified as the "Insured." Policy ¶I.S and Declarations Page **Answer at Exhibit 6 (ECF 100-6, #1040).** The Policy provides that "[t]here are no third-party beneficiaries to this Policy."  Policy ¶ IX.B at p. 32 **Answer at Exhibit 6  (ECF 100-6, #1068).**

The Policy states that it is the exclusive agreement between TracBeam and Series 1:

> E.   Entire Agreement.   This **Policy** constitutes the entire agreement between **Insured** and **Company** with respect to the matters covered herein.  This **Policy** supersedes all prior and contemporaneous agreements and oral understandings among **Insured** and **Company** with respect to such matters.

Policy IX.E. at p. 33 **Answer at Exhibit 6  (ECF 100-6, #1069).**  It further provides that its terms could "only be amended by an endorsement executed by an authorized representative of **Company.**"

One of the risks was insured under the Policy, was the "Loss of Key Supplier."  As defined by the Policy:

> 39.  "Loss of Key Supplier" event, which means:

a.   the wrongful termination or wrongful cancellation by a **Key Supplier** of any contract between **Insured** and **Key Supplier**; or

b.   the termination or cancellation of any contract between **Insured** and a **Key Supplier** as a result of:

i.   the cessation or suspension of the business operations of such **Key Supplier**;

ii.   the death of such **Key Supplier** or the bodily injury to or illness suffered by such **Key Supplier** resulting in such **Key Supplier's** inability to perform the same type of work that such **Key Supplier** performed prior to the bodily injury or illness;

iii.   the bankruptcy of such **Key Supplier**;

iv.   the merger or consolidation with another organization such that the **Key Supplier** is not the surviving organization, or the acquisition of more than 50% of the ownership interest of the **Key Supplier** by another organization, or person, or groups of organizations and/or persons acting in concert; or

v.   the adoption or promulgation of federal, state or local laws, regulations, or ordinances, by any legislative body, executive authority or agency, affecting such **Key Supplier's** business and resulting in increased costs or operating expenses, reduction in the **Key Supplier's** business production capacity, or the **Key Supplier's** withdrawal of a product or service from the market.

Policy ¶I.GG.39 at p. 19 **Answer at Exhibit 6 (ECF 100-6, #1055).** TracBeam designated, and Series 1 accepted, Dovel & Luner as a Key Supplier.

In the event of a Scheduled Event under the Policy, TracBeam is entitled to recover its "Actual Net Loss." For purposes of a claim involving "Loss of Key Supplier," the Actual Net Loss includes "Income Loss," which is defined as the loss "of net profit (before taxes) that would have been earned by the **Insured** during the **Period of Restoration** in the absence of the **Scheduled Event**." Policy ¶I.Q. at p. 4 **Answer at Exhibit 6 (ECF 100-6, #1040).** The "Period of Restoration" is the "period of time beginning at the time of the **Scheduled Event** and ending .

12

. . twelve months from the date that the **Scheduled Event** first occurs."  Policy ¶I.BB.2 at p. 5

**Answer at Exhibit 6 (ECF 100-6, #1041).**

TracBeam's Policy contains a number of exclusions.  Policy ¶ VI pp. 29-31 **Answer at**

**Exhibit 6 (ECF 100-6, ##1065-66).**  The first of these, Exclusion A, provides:

> This **Policy** does not apply to any **Actual Net Loss** related to or caused directly or indirectly by:
>
> A.  any fact, circumstances, situation, transaction, threatened **Claim** or **Administrative Action** or event which, as of the **Initial Effective Date, Insured** knew or reasonably should have known would be likely to result in the occurrence of a **Scheduled Event.**

Policy ¶VI.A. at p. 29 **Answer at Exhibit 6 (ECF 100-6, #1065).**[2]

The Notice of Claim, Denial, and Litigation

The Policy has an effective date of May 4, 2018, and was due to expire on May 4, 2019.

On April 18, 2019, via email, Dovel & Luner provided notice that it "no longer intends to represent

TracBeam, LLC with respect to any future patent infringement matters."  The email indicated that

there had been previous discussions with TracBeam and that TracBeam had requested the

termination email.  Dovel & Luner stated that "we simply do not believe that the remaining

infringement actions that TracBeam, LLC may be able to bring against the remaining infringers in

the industry would be sufficiently beneficial, economically, to our firm."  They continued, noting

that this was "primarily in light of: (a) the costs and risks associated with likely IPR filings at the

PTAB and motion practice under the recent line of Section 101 cases from the Federal Circuit and

various district courts, and (b) the difficulty in bringing suit against one or more infringers in a

suitable venue, following the strict requirements of the *TC Heartland* decision issued by the

Supreme Court in May 2017. . . ."  **Answer at Exhibit 10 (ECF 100-10, #1082).**  Within hours of

---

[2] The Initial Effective Date for this risk is specified as May 4, 2017.

receiving this notice, TracBeam filed a Notice of Claim.  **Answer at Exhibit 11 (ECF 100-11, #1083).**

The Complaint and the revised engagement letter reveal that the changes created by both the AIA and the *TC Heartland* decision led the law firm to significantly narrow its representation in 2017.  **Third Amended Complaint ¶ 25 (ECF 94 #968); Answer at Exhibit 9 (ECF 100-9, #1081).**  In the 2017 engagement, the law firm limited its representation to four infringers while specifically providing that it could choose to terminate its relationship "[i]f we conclude  that the expected value of your case has changed such that it is no longer worthwhile to pursue . . . . [and] if you choose to continue the litigation against our advice . . . we may terminate our representation of you."  **Answer at Exhibit 9 (ECF 100-9, #1081).**  By the time that the law firm terminated its engagement, settlements had been reached with two of the four infringers, and TracBeam had no lawsuits, claims, or inter partes reviews pending.  **Third Amended Complaint ¶ 28 (ECF 94 #968)**; **Answer at Exhibit 10 (ECF 100-10, #1082).**

Series 1, through an independent adjustor and its manager, reviewed the material submitted by TracBeam and, on November 6, 2019, denied the claim on the basis that none of the "triggering events" for "Loss of Key Supplier" applied.  **Answer at Exhibit 12 (ECF 100-12, #1084-85).**   On December 2, 2019, TracBeam's counsel submitted a written "response" to Series 1's denial.  **Answer at Exhibit 13 (ECF 100-13, #1086-90).**    Tellingly, counsel did not claim that coverage existed as a consequence of the *TC Heartland* decision, confining TracBeam's response solely to the changes created by the AIA.  Series 1 treated the "response" as an appeal of the initial claims decision, and after another review, denied the claim again.  **Answer at Exhibit 14 (ECF 100-14, ##1091-94).**  Series 1 did so on the basis that the changes effected by the adoption of the AIA did not occur during the 2018-2019 Policy year, that federal court decisions do not constitute the

14

"promulgation" of federal law within the meaning of the coverage, and that "courts are not legislative bodies, executive authorities or agencies." Series 1 further reserved all rights "including the right to assert any additional grounds that may exist for denying this claim." **Answer at Exhibit 14 (ECF 100-14, #1093).**

More than two years later, TracBeam instituted this litigation in Colorado. The U.S. District Court for the District of Colorado granted Series 1's Motion to Transfer based on the Policy's choice of venue clause on December 13, 2022. Plaintiffs filed a Second Amended Complaint on March 1, 2023, and, on September 1, 2023, a Third Amended Complaint, asserting claims for breach of the Policy and for promissory estoppel.

## Standard of Review

A motion for judgment on the pleadings under Fed.R.Civ.P. Rule 12(c) applies the same legal standard as a motion to dismiss under Rule 12(b)(6). *D'Ambrosio v. Marino,* 747 F.3d 378, 383 (6th Cir. 2014). To survive, a complaint must allege enough facts to state a claim for relief that is plausible on its face and which "raise a right to relief above the speculative level." *Bell Atlantic v. Twombly,* 550 U.S. 554, 570 (2007). But pleaded facts will not give rise to an entitlement to relief "if they 'are merely consistent with' a defendant's liability." Rather, alleged facts must, in light of the pleadings as a whole, "plausibly give rise to an entitlement to relief." *Bates v. Green Farms Condominium Association,* 958 F.3d 470, 480 (6th Cir. 2020) (dismissing Complaint under Rule 12(c)).

In reviewing the sufficiency of a complaint, "courts must accept as true all well-pleaded factual allegations, but they need not accept legal conclusions." *Bates,* 958 F.3d at 480. Put differently, "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *O'Bryan v. Holy See,* 556 F.3d 361, 376 (6th Cir.

2009).  As characterized by the Sixth Circuit, "[t]o survive a motion to dismiss, a plaintiff can't make conclusory allegations that the defendant violated the law and leave it at that."  *South Side Quarry, LLC v. Louisville & Jefferson County Metropolitan Sewer District,* 28 F.4th 684, 693 (6th Cir. 2022).  A court is further not required to accept allegations that "contradict matters properly subject to judicial notice or [by] exhibit."  *Massey v. Ojaniit,* 759 F.3d 343, 347 (4th Cir. 2014).  Rather, this Court may rely upon exhibits in the pleadings that contradict factual allegations where there is no issue of authenticity or where the exhibits are properly subject to judicial notice and embrace the issue raised by the complaint.  *See, e.g., Massey,* 759 F.3d at 353 (trial transcript attached as exhibit).  Thus, a "court presented with a Rule 12(b)(6) motion 'may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibit attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein."  *Basset v. National Collegiate Athletic Association,* 528 F.3d 426, 430 (6th Cir. 2008).  *See Eye Centers of America, LLC v. Series Protected Cell 1,* 583 F. Supp.3d 1105, 1114 (2022) ("Accordingly, while the court is required to accept [Plaintiff's] factual allegations and to avoid factual questions that are not fairly raised by the pleadings, the court is not required to accept [Plaintiff's] characterization of what the Executive Orders actually said or, as a legal matter, did.") (dismissing Complaint under Rule 12(c)).

Finally, as recently noted by Judge Trauger, under Rule 12(c) "in addition to the court's consideration of what [Plaintiff] *has* alleged in its Complaint, the court is also permitted to examine what [Plaintiff] did *not* allege. . .   It is not sufficient to allege facts that are 'merely consistent with' liability while eliding other, more problematic factual issues that are nevertheless essential to the claim."  *Eye Centers of America,* 583 F. Supp.3d at 1114-15.

16

In diversity cases, this Court will apply the choice-of-law rules for Tennessee. *State Farm Mut. Auto. Ins. Co. v. Norcold, Inc.,* 849 F.3d 328, 331 (6th Cir. 2017). Where, as here, there is a choice of law clause by the parties, Tennessee courts typically honor that choice of substantive law. *Boswell v. RFD-TV the Theater, LLC,* 498 S.W.3d 550, 556 (Tenn. Ct. App. 2016). And here the parties have chosen Tennessee law. Policy ¶IX.F. at p. 33 **Answer at Exhibit 6 (ECF 100-6, #1069).**

Under Tennessee law, "a claimant under an insurance policy has the initial burden of proving that he comes within the terms of the policy." *Blaine Const. Corp. v. Insurance Co. of North America,* 171 F.3d 343, 349 (6th Cir. 1999). The "question of the extent of insurance coverage is a question of law involving the interpretation of contractual language." *Eye Centers of America,* 583 F. Supp.3d at 1115. Under Tennessee law, the "interpretation of a written contract is a matter of law, rather than a matter of fact," and in "resolving disputes concerning contract interpretation, our task is to ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the contractual language." *Walker v. Beasley,* 2009 WL 4801480, at *3 (Tenn. Ct. App. Dec. 15, 2009). It is only if language is "genuinely ambiguous," *Eye Centers of America,* 583 F. Supp.3d at 1116, that its provisions must be "construed against the insurance company and in favor of the insured." *Allstate Ins. Co. v. Watts,* 811 S.W.2d 883, 886 (Tenn. 1991).

<u>**ARGUMENT**</u>

I.     <u>**THE LAW FIRM'S TERMINATION OF ITS SERVICES IS NOT A COVERED EVENT UNDER THE "LOSS OF KEY SUPPLIER" PROVISIONS.**</u>

   A.   <u>**The Coverage for "Loss of Key Supplier"**</u>

17

The Policy does not provide coverage any time a "Key Supplier" ends a commercial relationship with an Insured. Rather, coverage is explicitly limited to specific events. Policy ¶I.GG.39(a), (b)(i)-(iv), **Answer at Exhibit 6 (ECF 100-6, #1055)**.

Here, the only basis for the Plaintiffs' claim is ¶ I.GG.39 (b)(v), concerning regulatory changes. TracBeam must show that its relationship with Dovel & Luner was terminated or cancelled "as a result of" the "adoption or promulgation of federal . . . laws regulations or ordinances by any legislative body, executive authority or agency." The issue then is whether the law firm's withdrawal was "as a result of" the adoption or promulgation of a federal law, regulation or ordinance by a legislative body, an executive authority, or an agency.[3] Moreover, the Policy requires that both the event - - the termination of the engagement - - and the cause of the event occur during the Policy year. But here, the cause of the event, the AIA changes, did not occur during the Policy year.

Even if the law firm's termination came about as a result of a change in law by a legislative or executive body that occurred during the Policy period, then a related question is whether, under Exclusion A, TracBeam had knowledge of these circumstances before the designated Initial Effective Date of the Policy (May 4, 2017). If so, then coverage is excluded.

## B. <u>The Supreme Court's Decision in *TC Heartland* Is Not the Promulgation of Federal Law by Action of a Legislative Body or Executive Authority or Agency</u>

The Complaint claims that the Supreme Court's decision in *TC Heartland* fell within the "regulatory change" provision and was a cause of the law firm's termination because it "caused a reduction in D&L's ability to handle TracBeam's cases given that D&L litigated most effectively

---

[3] For purposes of this Motion only, the Defendants will assume that the law firm's termination of its engagement with TracBeam constitutes the withdrawal or reduction of services in a particular market.

18

in, and preferred the Texas Federal Courts."  **Third Amended Complaint ¶ 29 (ECF 94 #968).**
Neither the termination notice nor the Third Amended Complaint explains how the law firm's
costs increased or its production capacity decreased simply because it could no longer forum shop.

But the fundamental coverage flaw with this claim is that judicial decisions are not within
the plain language of the Policy.  A loss under this subsection must be as a result of the adoption
or promulgation of laws, regulations, or ordinances by "any legislative body, executive authority
or agency."  Pointedly, this language does not include the judicial branch, the judiciary, or any
other language that could be interpreted to extend to a court decision.  Under Tennessee law, in
"resolving disputes concerning contract interpretation, our task is to ascertain the intention of the
parties based upon the usual, natural, and ordinary meaning of the contractual language." *Walker
v. Beasley,* 2009 WL 4801480, at *3 (Tenn. Ct. App. Dec. 15, 2009).  The "usual, natural, and
ordinary meaning" of "legislative body," "executive authority," or "agency" does not include the
judiciary or judicial branch.  The term "legislative" means the "act of giving or enacting laws,"
*Black's Law Dictionary,* or "having the power or performing the function of legislating." and the
word "legislating" is "to make or enact laws." *Merriam-Webster Dictionary* (2023).  Federal
courts neither legislate nor even exercise general oversight of either the legislative or executive
branches, a point recently noted by Justice Kavanaugh in *TransUnion LLC v. Ramirez,* 141 S.Ct.
2190, 2203 (2021) ("Under Article III . . . .  Federal courts do not exercise general legal oversight
of the Legislative and Executive Branches . . . ."), and one which finds its origins in the framer's
understanding of Article III itself.  *See id.* quoting Madison, Records of the Federal Convention of
1787 ("federal courts instead decide only matters 'of a Judiciary Nature.'").  And Tennessee law
always has distinguished between legislative, executive, and judicial powers, finding that each is
separate and distinct.  *Richardson v. Young,* 125 S.W. 664, 668 (1910) ("It is essential to the

maintenance of republican government that the action of the legislative, judicial, and executive departments should be kept separate and distinct. . . .   Theoretically, the legislative power is the authority to make, order, and repeal, the executive, that to administer and enforce, and the judicial, that to interpret and apply, laws.").

In addition, a judicial decision does not "adopt" or "promulgate" a law or ordinance.  It only interprets a law or ordinance and applies it to the facts of the case before it.  And here the Court plainly interpreted an existing statutory scheme - - it promulgated no rule, law or ordinance but merely read the existing venue statutes enacted by Congress to determine their applicability. The issue in *TC Heartland* was whether the patent venue statute that was enacted in 1948, 28 U.S.C. §1400(b), which restricted the concept of "residence" to a corporation's State of incorporation, had somehow been changed by amendments to the general venue statute, 28 U.S.C. § 1391.  The Court found that nothing had changed and that the venue rules that had existed in patent cases since 1948 continued in effect:

> Congress has not amended §1400(b) since *Fourco* [*Glass Co. v. Transmirra Products Corp.,* 353 U.S. 222 (1957)], and neither party asks us to consider our holding in that case.  Accordingly, the only question we must answer is whether Congress changed the meaning of §1400(b) when it amended §1391. . . .  The current version of §1391 does not contain any indication that Congress intended to alter the meaning of §1400(b) as interpreted in *Fourco.*

581 U.S. at 268.  As such, because the "amendments to § 1391 did not modify the meaning of §1400(b) as interpreted by *Fourco*" the Court held "that a domestic corporation 'resides' only in its State of incorporation for purposes of the patent venue statute."  581 U.S. at 262.  In so ruling, the Court simply reaffirmed what the law had been since 1948.

*TC Heartland* plainly did not "promulgate" a "law, regulation[ ], or ordinance [ ]." Its decision rested on a statutory enactment that existed decades before TracBeam was ever insured under this Policy.   The fact that TracBeam may have been the beneficiary of an incorrect

20

interpretation of the patent venue statute, which permitted it to choose a preferred venue, does not mean that *TC Heartland* promulgated a new law or regulation (let alone one from a legislative body, executive authority or agency).

The Plaintiffs make much of the fact that, under the Rules Enabling Act, 28 U.S.C. §2072 *et seq.,* the Supreme Court promulgates the Rules of Procedure and Rules of Evidence to be used in the courts. The Plaintiffs claim that the ability to make those rules thus makes the Supreme Court a body that "promulgates" regulations and is thus a "regulatory body" within the meaning of the phrase "legislative body, executive authority or agency." This argument fails for several reasons. First, acts by a "regulatory body" are not the acts of a "legislative body, executive authority or agency" - - and the Supreme Court is not a legislative body, executive authority or agency. Moreover, even this power to issue rules that govern court proceedings is limited by the requirement that "[s]uch rules shall not abridge, enlarge or modify any substantive right," 28 U.S.C. §2072(b), and is further subject to Congressional oversight and even approval.[4] But more fundamentally, *TC Heartland* has **nothing** to do with the Federal Rules of procedure or evidence. It was a decision that interpreted the effect of congressionally enacted venue statutes. Thus, even if somehow the concept of "legislative body, executive authority or agency" could be stretched to include the Supreme Court when it acts to "prescribe general rules of practice and procedure and rules of evidence," the Court was not acting in this capacity in *TC Heartland.*

Finally, while the termination letter sent by the law firm cites *TC Heartland* as a cause of increased costs, the Complaint reveals that "change" did not result in a loss in 2019. Rather, the

---

[4] The Court is required to submit proposed Rules or changes to Congress by May 1 of the year in which they are to take effect, and proposed Rules may not take effect before December 1. 28 U.S.C. § 2074(a). Moreover, rules modifying evidentiary privileges must explicitly be approved by Act of Congress. 28 U.S.C. § 2074(b).

Complaint concedes that the law firm entered into "a new contingent fee agreement" on June 26, 2017, after the decision in *TC Heartland* On May 22, 2017. **Third Amended Complaint ¶ 25 (ECF 94, #968).** Thus, the new contingent fee arrangement was made with full knowledge of that decision and reflected its impact. The simple truth is that by April 18, 2019, TracBeam had no more infringement claims worth pursuing, and so the law firm terminated the engagement - - which it was entitled to do and as it had predicted it would do in the text of the engagement agreement. **Answer at Exhibit 9 (ECF 100-9, #1081).**

### C. The Additional Procedures Created by the America Invents Act of 2013 Cannot Create a Loss in 2019

In contrast to the decision in *TC Heartland,* the AIA was a legislative enactment by a legislative body that significantly changed the patent laws. The Complaint cites the increased use of inter partes review, which permitted a patent's validity to be challenged before the PTAB. But the PTAB was created on September 16, 2012, and the Final Rules, Trial Practice Guides, and Rules for Inter Partes Review were issued between February 9, 2012 and March 25, 2013. **Answer at Exhibit 3 (ECF 100-3, ##1027-30); United States Patent and Trademark Office, "Inter Partes Disputes," https://www.uspto.gov/patents/laws/america-invents-act-aia/inter-partes-disputes#.** The Complaint alleges that by 2017, the costs for defending such reviews had amounted to $451,000 per IPR and that Tracbeam was the subject of 29 IPR filings challenging its patents. **Third Amended Complaint ¶ 23 (ECF 94, #967).**

However, the Complaint does not point to any changes in rules or procedures or other enactments related to inter partes review during the Policy Year 2018-19 that resulted in Dovel & Luner's termination. Rather, the Third Amended Complaint makes clear that the inter partes review process was fully functional and operating (and had already increased costs) by 2017, while

the law firm's termination happen did not happen until April 2019. In addition, the termination letter cites no changes in rules or to the inter partes procedures that took place during Policy Year 2018-19 that increased costs or lead to the termination. Indeed, TracBeam did not even have any infringement or inter partes reviews pending at the time of the termination. Rather, the law firm's desire to end the relationship was based on the "costs and risks associated with *likely* IPR filings." (emphasis supplied). The termination letter also makes clear in its reference to "risks" that the issue was not solely one of cost, but necessarily the very real risk that TracBeam's patents could be declared invalid under inter partes review, a risk not covered under the Policy.

Under the Policy, the "Loss of Key Supplier" must be "as a result of" specified causes. To be covered, both the end of the supplier relationship and the cause which resulted in the termination must occur in the Policy year. A brief review of the other causes listed under "Loss of Key Supplier" - - death, merger, cessation of business - - all necessarily occur during the same Policy year as the loss of the supplier relationship. Put simply, the loss of the supplier relationship is not a "loss" unless it is as "a result of" a new law or regulation that was enacted during the Policy year. Moreover, this reading also makes sense - - the Policy is designed to insure against the fortuitous loss of a relationship caused by changes in regulations or laws which previously did not exist that effectively put the supplier out of business. It is not intended to insure against legislative or other changes in regulation that have existed for years, and under which the parties have been operating. Nor is it intended to insure against the accretion of costs over time, but only against fortuitous changes in regulation that unexpectedly increase costs to the point that the "Key Supplier" withdraws from the market. To read the Policy otherwise would be to argue that, as an example, when the loss is caused by death of the supplier, the death could occur years before the relationship is terminated. Permitting the Plaintiffs to claim a loss in 2019 based upon the changes enacted by

the AIA in 2012 would give the Plaintiffs a "wild card" to claim a loss that occurs at any time in the future.

**D. TracBeam's Loss is Excluded by Exclusion A.**

What the pleadings do demonstrate is that Exclusion A bars this claim. The Complaint reveals that the inter partes review process was the result of legislation enacted in 2011, the operation of the PTAB beginning in 2013, and was fully functional by 2013 (under which thousands of reviews had taken place by 2015). By 2017, the Complaint concedes that the costs of IPR reviews were significant and that 29 of TracBeam's patents had been challenged. In 2017, TracBeam entered into a new engagement agreement with the law firm, one that limited the representation to four patent infringers with the right to terminate representation when the law firm concluded that the game was no longer worth the candle. This new engagement foretold that the law firm would, at some point, cease representing TracBeam - - either when resolutions with the four infringers had occurred or sooner if the law firm determined that there was no purpose to further filings. All of these facts and circumstances were plainly known to TracBeam before the Initial Effective Date of the 2018-2019 Policy (May 2017) and all would have led a reasonable person to conclude that the relationship would end. They are thus excluded under the prior knowledge exclusion in Exclusion A.

The Plaintiffs do not claim that they were not aware of the facts or circumstances cited by the law firm (nor could they). Instead, they allege they had "no reason to believe" that the law firm intended to terminate its representation of them as of the date of the new engagement. **Third Amended Complaint ¶ 26 (ECF 94 #968).** Their subjective belief, however, is not the standard to be used. Rather, the issue is whether they "reasonably should have known" these facts and circumstances "would be likely to result" in the law firm's termination. Policy VI.A. p. 29,

24

**Answer at Exhibit 6 (ECF 100-6, #1065).** Any reasonable reading of the new contingent fee agreement reveals that the relationship was coming to an end, either when the four infringers were dealt with or sooner if the law firm determined that the claims were not sufficiently worthwhile to pursue. While the precise date that the relationship would end may not have been known, it was clearly going to end soon.

## II.  TRACBEAM CANNOT RELY ON CLAIMS OF ESTOPPEL TO EXPAND COVERAGE.

In their most recent Complaint, and in the alternative, the Plaintiffs seek to avoid the application of these Policy provisions by claiming coverage under the concept of promissory estoppel. They claim that statements were made before the Policy was issued which led them to believe they would have coverage for any judicial decision concerning venue, or for the departure of the law firm based on any "other factors." **Third Amended Complaint ¶ 48 (ECF94 #974).** As a result, they seek to estop Series 1 from disputing coverage.

Under Tennessee law, an insured which seeks coverage through estoppel must prove three elements: (1) the insured was without both "the knowledge and . . . the means of knowledge of the truth as to the facts in question," (2) the insured "reasonably relied upon the conduct or representations of the party to be estopped," and (3) the insured took action based on these representation "of such a character as to change his position prejudicially." *Finchum v. Patterson,* 2008 WL 2019408, at *8 at n. 3 (Tenn. Ct. App. May 9, 2008). Not only do the Plaintiffs bear the burden of proof on these elements, *Robinson v. Tennessee Farmers Mut. Ins. Co.,* 857 S.W.2d 559, 563 (Tenn.Ct.App. 1993), but Tennessee statutory law creates a presumption that in paying the premium, the insured accepted the coverage provided under the contract. Tenn. Code Ann. §56-7-135. This statutory presumption transforms the issue of whether an insured's claimed reliance on extracontractual statement was reasonable into a question of law. *Vanquish Worldwide, LLC*

*v. Sentinel Ins. Co., Ltd.,* 2022 WL 189791, at *3 (Tenn.Ct.App. Oct. 13, 2021). Moreover, "Tennessee decisions make clear that . . . where the policy states that its terms can be amended or waived only by the company, the insured is charged with that knowledge and a claim for waiver by estoppel will not lie." *Depositors Ins. Co. v. Estate of Ryan,* 212 F. Supp.3d 728, 734 (W.D. Tenn. 2015) quoting *Builders Mut. Ins. Co. v. Pickens,* 2013 WL 3788225, at *3 (E.D. Tenn. July 18, 2013) ("where the policy states that its terms can be amended or waived only by the company, the insured is charged with that knowledge and a claim for waiver by estoppel will not lie.").

The Plaintiffs' estoppel claim fails for at least three reasons.

First, the Plaintiffs do not plead or claim that TracBeam (or its manager, Dupray) did not have the knowledge or "the means of knowledge of the truth" as to the parameters of coverage. In fact, the opposite is true. Dupray was specifically provided the language of the Policy before establishing the captive and paying premium. **Answer at Exhibit 15 (ECF 100-15, #1095).** And in 2018, before purchasing the coverage at issue in this matter, he not only reviewed the terms of the Policy *but had attorneys do so as well*. **Answer at Exhibits 16 (ECF 100-16, #1097).** Because Dupray had the plain language of the Policy before him, he (and his attorneys) had the means to understand the limitations of the coverage. Moreover, in the Review provided by Risk International Strategies, Dupray had been specifically warned with regard to coverage for "Loss of Key Supplier" that "[c]are should be given to understand the specific losses that **Loss of Key Supplier** and **Supplier/Supply Chain** coverage may insure against." **Answer at Exhibit 5 (ECF 100-5, #1095).** A similar warning was on the first page of the Policy itself: **"VARIOUS PROVISIONS RESTRICT COVERAGE. READ THE ENTIRE POLICY CAREFULLY TO DETERMINE RIGHTS, DUTIES AND WHAT IS AND IS NOT COVERED." Answer at Exhibit 6 (ECF 100-6, #1037).**

26

Second, as a matter of law, the Plaintiffs' reliance on the statements they claim led them to believe that coverage would be provided was not reasonable. Under Tennessee law, by paying premium, TracBeam is presumed to have accepted the Policy coverage as written. The Policy further made clear that it "constitutes the entire agreement," that it "supersedes all prior and contemporaneous agreements and oral understandings," and that it could only be amended by "an endorsement executed by an authorized representative" of Series 1. Policy IX. D. and E. at p. 33 **Answer at Exhibit 6 (ECF 100-6, #1069).** This language, when combined with the statutory presumption under Tennessee law, means that the Plaintiffs are charged with knowledge of the terms of the Policy and cannot claim a waiver by estoppel. *See Reed v. National Foundation Life Ins. Co.,* 1996 WL 718467, at *3 (Tenn.Ct. App. Dec. 16, 1996) ("it is settled law in Tennessee that [the insured] is nonetheless charged with knowledge of their [application for coverage] contents."). And federal courts in the Eastern and Western Districts of Tennessee have granted judgments as a matter of law on precisely these grounds. *Depositors Ins. Co.,* 212 F. Supp.3d at 734 (W.D. Tenn. 2015); *Builders Mut. Ins. Co.* 2013 WL 3788225, *3 (E.D. Tenn. July 18, 2013).

Finally, the statements that the Plaintiffs claim led them to believe there was coverage in fact say no such thing. As noted above, the Review contained a specific warning on this particular coverage that "care" should be given to understand the limitations of the coverage. The actuarial reports cited by the Plaintiffs not only do not represent that coverage included venue or judicial decisions, but merely recite the coverage provision accurately (and tell TracBeam to check any statements against its own records). The Plaintiffs' claim that entering into a feasibility study meant that the scope of the study would define the coverage is belied by what the Letter of Engagement actually says: "We are not an insurance agent, broker or advisor and do not and are not licensed to sell insurance, enter into a captive insurance arrangement, or sell any series of any

27

company or any securities.  We will not be rendering any legal, tax, investment, financial or other advice."  **Answer at Exhibit 4 (ECF 100-4, #1031).**

### III.     <u>TRACBEAM HAS FAILED TO PLAUSIBLY ALLEGE THAT IT SUFFERED AN ACTUAL NET LOSS DURING THE PERIOD OF RESTORATION</u>

TracBeam further fails to plausibly allege that it suffered an actual net loss following the law firm's termination.  While TracBeam now "estimates" that it "suffered a loss of no less than $2,800,000," its latest Complaint shows the opposite.  First, TracBeam makes no allegation that in the 12-months following the termination it suffered this (or any) loss.  To the contrary, it is undisputed that as of the termination TracBeam had no pending litigation.  And the Complaint also reveals that even though TracBeam hired new counsel in December 2019, as of September 2023, it has not initiated any infringement claims since the termination.  **Third Amended Complaint ¶ 42 (ECF 94 #973).**  It is not plausible that, having failed to initiate any litigation in nearly four years since it retained new counsel, that TracBeam would have filed and resolved new litigation claims by April 2020 had the law firm not terminated its relationship.  Indeed, the termination letter itself proves that TracBeam suffered no actual net loss, for it is based on the law firm's assessment that "we simply do not believe that the remaining infringement actions that TracBeam, LLC *may be able to bring against the remaining infringers* would be sufficiently beneficial, economically, to our firm. . . ."   (emphasis supplied).  **Answer at Exhibit 10 (ECF 100-10, #1082).**  The reality is that TracBeam ran out of companies that it could profitably sue.

### IV.     <u>DUPRAY IS NOT INDIVIDUALLY ENTITLED TO BRING THIS LAWSUIT</u>

Dr. Dupray is listed as a Plaintiff in his capacity as the "beneficial owner" and "managing partner" of TracBeam.  Neither status permits him to be an individual plaintiff in this matter.

28

The Policy is a written contract between the Named Insured, TracBeam, and Oxford ("the Company"). Absent an assignment of benefits, it provides for no third-party beneficiaries. Policy ¶ IX.B at p. 32 **Answer at Exhibit 6 (ECF 100-6, #1068).** ("There are no third-party beneficiaries to this Policy.")**.** The Policy further provides that it "may be enforced only by **Insured** and **Company** and their respective assigns." *Id.* And Colorado law, the State in which TracBeam is incorporated, makes it plain that unless the intent to create a third-party beneficiary is made clear, courts will not infer that third-parties, even as "managers," have a third-party claim. *Johnstown Feed & Seed, Inc. v. Continental Western. Ins. Co.*, 641 F. Supp. 2d 1167, 1173–75 (D. Colo. 2009).

Moreover, the fact that TracBeam is a limited liability company also prevents Dupray, as a member, from individually making a claim under both Tennessee law and Colorado law. Rather, in both States, the only entity that can make a claim for a company is the company and neither its members nor its managing partner have standing to bring a claim in their individual capacities. *See Johnstown Feed & Seed, Inc. v. Continental Western. Ins. Co.*, 641 F. Supp. 2d 1167, 1173–75 (D. Colo. 2009); *Young v. Bush*, 277 P.3d 916, ¶¶ 60-61 (Colo. COA, Div. A, 2012); *ARC LifeMed, Inc. v. AMC-Tennessee, Inc.*, 183 S.W.3d 1, 23 (Tenn. Ct. App. 2005).

## Conclusion

For the reasons set forth in this Memorandum, the Court should grant the Defendants' Motion for Judgment on the Pleadings.

Respectfully submitted,

*/s/ James P. Cooney III*

James P. Cooney III, admitted *Pro Hac Vice*
Marcey Rose Selle, admitted *Pro Hac Vice*
James Shelton Derrick, admitted *Pro Hac Vice*
WOMBLE BOND DICKINSON
    (US) LLP
301 South College Street, St 3500
Charlotte, North Carolina 28202
Telephone: (704) 331-4900
jim.cooney@wbd-us.com
Marcey.Selle@wbd-us.com
James.Derrick@wbd-us.com

DICKINSON WRIGHT PLLC

*/s/ Jeffrey M. Beemer*

Jeffrey M. Beemer, #17247
424 Church Street, Suite 800
Nashville, TN 37219
Telephone: (615) 244-6538
Facsimile: (844) 670-6009
Email: JBeemer@dickinsonwright.com

*Attorneys for Defendants Oxford Insurance*
*Company TN LLC and Series Protected Cell 1,*
*a Series Entity of Oxford Insurance Company TN,*
*LLC*

30

**CERTIFICATE OF SERVICE**

I certify that I have served a copy of the foregoing via the Court's ECF system to:

W. Russell Taber III
Riley & Jacobson, PLC
1906 West End Avenue
Nashville, TN 37203

Thomas Dean Neville
Kamerman Uncyk Sonikier & Klein
1700 Broadway, 16th Floor
New York, NY 10019

John Michael Johnston
Law Office of John Michael Johnston
Suite 620 Robert S. Kerr Avenue
Oklahoma City, Oklahoma  73102

Dated:   October 2, 2023.

*/s/ Jeffrey M. Beemer*
Jeffrey M. Beemer